# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-1345
Filed July 8, 2026

———————————

**In re the Marriage of Taylor Danielle Van Kooten and Nathan Lee Van Kooten**

Upon the Petition of
**Taylor Danielle Van Kooten, n/k/a Taylor Danielle Ahrens,**
Petitioner–Appellee,

And Concerning
**Nathan Lee Van Kooten,**
Respondent–Appellant.

———————————

Appeal from the Iowa District Court for Poweshiek County,
The Honorable Crystal S. Cronk, Judge.

———————————

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**

———————————

Bryan J. Goldsmith (argued) and Carly M. Schomaker of Gaumer, Emanuel & Goldsmith, P.C., Ottumwa, attorneys for appellant.

Robert S. Seer (argued) and Patrick J. Mahaffey of Mahaffey Law Office, P.C., Montezuma, attorneys for appellee.

———————————

Heard at oral argument
by Tabor, C.J., and Chicchelly and Sandy, JJ.
Opinion by Sandy, J.

**SANDY, Judge.**

Like many parents, Taylor Ahrens and Nathan Van Kooten are in a good faith but immovable parenting disagreement. Taylor wants to homeschool B.V.K., one of the parties' three children, due to major behavioral issues at school. Nathan wants to keep the child in public school, believing B.V.K. to be capable of handling public school. The parties otherwise cooperate well in parenting matters and have successfully co-parented the children following the 2021 dissolution of their marriage.

Because the dissolution decree does not contain any provisions permitting the district court to make determinations relating to B.V.K.'s schooling, our supreme court's holding in *In re Marriage of Frazier* required Taylor to file a petition for modification to resolve this impasse. *See* 1 N.W.3d 775, 779 (Iowa 2024). And the choice of a child's educational path is one committed to the joint legal custodians and, when they reach impasse, to the court. *See Venechuk v. Landherr*, 20 N.W.3d 471, 474 (Iowa 2025). Yet the district court resolved that impasse by stripping Nathan of legal custody to all three of his children. We agree the schooling impasse is a substantial and material change in circumstances and that, on this record, homeschooling B.V.K. serves her best interests. But the remedy swept far wider than the dispute called for. *Frazier* closed one narrow door; *Venechuk* opened another—the ordinary modification of a continuing judgment, which resolves the parties' single educational disagreement without dissolving legal custody. We therefore affirm in part, reverse in part, and remand.

## BACKGROUND FACTS AND PROCEEDINGS

Nathan and Taylor divorced in 2021. Pursuant to the parties' joint stipulation, the decree gave them joint legal custody over their three children, E.V.K., B.V.K., and A.V.K., born in 2016, 2018, and 2019, respectively. Taylor

was granted physical care of the children with reasonable and liberal visitation for Nathan. Notably, the stipulation did not provide any express provisions relating to the children's education except that "[t]he parents shall participate equally decisions affecting the children's legal status, medical care, education, extracurricular activities, and religious training."

Since the divorce, Taylor has lived in Montezuma with her husband, the three children, and the child she has with her current husband. E.V.K. and B.V.K. were both school age at the time of the modification hearing. E.V.K has done well in school, both academically and behaviorally, but B.V.K. has suffered from major behavioral deficits, which have negatively impacted her schooling and are at issue in these modification proceedings.

B.V.K. has suffered from behavioral irregularities since a young age. She has been removed from multiple daycares, which prompted involvement of the Area Education Agency (AEA). She was able to begin a "begindergarten" program in fall 2023 and was provided an individualized education plan (IEP) to assist her in her behavioral struggles. Despite this, she kicked a pregnant paraeducator, which resulted in the teacher's hospitalization and B.V.K. being suspended. She was permitted to return on a half-day schedule. The half-day schedule did not result in improved behavior. There were multiple incidents of B.V.K. throwing objects at teachers and students, using coarse language, and hitting and kicking others. B.V.K.'s teacher reported that she was having outbursts every day. The teacher reported in a letter that, although she had found some strategies for increasing B.V.K.'s "on-task" behavior, those moments of stability were fleeting and inconsistent. The teacher testified that B.V.K. was "becoming more than [she] was able to handle."

Following B.V.K.'s suspension in December 2023, the parties considered options going forward. Nathan suggested homeschooling, but Taylor did not see that as a possible option due to her employment commitments. The parties continued to discuss homeschooling, and a month later Taylor informed Nathan that she believed homeschooling was the best option. At this point, Nathan said he needed time to think about it. Several days later, Nathan texted that he had only considered homeschooling as a "last option" but then told Taylor, "you do what you do and I'll do what I have to do." Taylor proceeded to share homeschooling curriculum information with Nathan and began to homeschool B.V.K. Taylor testified that B.V.K.'s behavioral struggles decreased and that B.V.K. had a consistent daily schedule.

In March 2024, Nathan applied for contempt and a temporary injunction against Taylor, arguing that she violated the decree by homeschooling B.V.K. He further requested B.V.K. be placed back in public school. The district court entered a temporary injunction ordering B.V.K. to be returned to public school and set a hearing for the contempt application. One of B.V.K.'s teachers testified that B.V.K. became more physical "than ever before" and that B.V.K.'s behavior "was very overwhelming." This behavior continued as B.V.K. entered kindergarten, although teachers did not keep as detailed records of B.V.K.'s kindergarten performance as her begindergarten teachers had. Nathan testified that B.V.K.'s behavior improved through the year, but it is difficult to verify the extent to which that was the case—the district court simply concluded that B.V.K.'s year in kindergarten resulted in "deteriorated" behaviors and that she was "pulled out of the regular classroom often due to her behaviors." But B.V.K. did well academically and was progressing as expected.

Mediation between the parties was unsuccessful. Taylor then petitioned to modify the custody decree, requesting sole legal custody over the children due to the parties' disagreement over whether to homeschool B.V.K. or send her to public school.[1] Taylor contended the impasse was "a substantial change in circumstances of a profound and permanent nature." Following a modification hearing in June 2025, the district court granted Taylor sole legal custody of all three children, agreeing that a substantial change in circumstances had occurred and denied Nathan's application for contempt.

Nathan now appeals.

## STANDARD OF REVIEW

Because petitions to modify the custodial provisions of a dissolution decree are actions in equity, our review is de novo. *See In re Marriage of Quirk–Edwards*, 509 N.W.2d 476, 476 (Iowa 1993); Iowa R. App. P. 6.907. We give weight to the district court's factual findings, especially as it relates to the court's credibility determinations, but are not bound by them. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). "The best interest of the child is the governing factor in custody cases." *In re Marriage of Kirman*, No. 02-2002, 2003 WL 21230952, at *2 (Iowa Ct. App. May 29, 2002).

---

[1] In Taylor's "Request for Relief" she requested "The children shall be allowed to be homeschooled by the Petitioner." In paragraph seventeen of her petition she requested that the court "determine regarding what school is in the best interest of the minor children." The ending paragraph of the Petition requested that the "original Decree be modified to provide . . . that homeschooling is in the best interest of the minor children, and for such other relief as the court deems just and appropriate under the circumstances."

Trial courts in Iowa Code chapter 598 (2024) contempt proceedings have "broad discretion and unless this discretion is grossly abused, the trial court's decision must stand." *In re Marriage of Swan*, 526 N.W.2d 320, 327 (Iowa 1995) (cleaned up).

## DISCUSSION

### I. Substantial and Material Change in Circumstances

"[O]nce custody has been fixed it should be disturbed for only the most cogent reasons." *In re Marriage of Brown*, 778 N.W.2d 47, 52 (Iowa Ct. App. 2009). Consequently, a party seeking sole legal custody when the decree has granted joint legal custody faces a "heavy burden." *In re Marriage of Harris*, 877 N.W.2d 434, 440–41 (Iowa 2016). The supreme court long ago explained the burden a parent seeking modification carries:

> To change a custodial provision of a dissolution decree, the applying party must establish by a preponderance of evidence that conditions since the decree was entered have so materially and substantially changed that the children's best interests make it expedient to make the requested change. The changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary. They must relate to the welfare of the children.

*In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983).

The appeal now before us is not a routine disagreement over school districts based on the parents' disparate home locations or whether one district better suits the child's interests or schedule. Rather, this case involves a child with heightened behavioral demands such that the child has struggled in a traditional public school district. Contrary to Nathan's suggestion that B.V.K. initially thrived in the public school district, B.V.K. has struggled through all attempts at outside schooling since the dissolution. At the time of

the dissolution, B.V.K. was only three years of age and had not started any formal education.

Before she even began school, B.V.K. was forced out of multiple daycares. She was later suspended from "begindergarten." As the district court noted, she was only allowed to return after the AEA became involved. Even after that, B.V.K. struggled with violent outbursts against other students and teachers, as well as other anti-social behavior. Following the suspension, Nathan suggested that B.V.K. should be homeschooled. The reason homeschooling was not pursued at that time was because Taylor was still running her dog grooming business. But the idea stuck with Taylor, and she proceeded to give it more thought and continued to discuss it with Nathan. Taylor went on to homeschool B.V.K. The district court concluded that the child's "behavior improved, and she did well in the homeschool studies." B.V.K. returned to school after the court granted Nathan's contempt and temporary injunction application. B.V.K.'s behavioral issues began to arise again, and B.V.K. engaged in significant disruptive and even violent behavior such as throwing scissors at another student's face, hitting a student in the neck with a stick, and biting and kicking multiple students and teachers.

These issues continued into kindergarten, although the detail of the reporting on B.V.K.'s behavior—good or bad—declined from that during begindergarten. Yet there were reports of troubling incidents such as B.V.K. threatening to bring a gun to school to shoot a substitute teacher and other disruptive or violent behavior.

In our view, Nathan's original suggestion of homeschooling with Taylor's eventual implementation of that suggestion appears to be the closest semblance of agreement the two parents came to on the issue and weighs

toward homeschooling being in B.V.K.'s best interests, even aside from B.V.K.'s pattern of disruptive and violent behavior. And the scale tips even further in favor of homeschooling when considering the plethora of incidents scattered across the short period during which B.V.K. has been in school. Furthermore, B.V.K.'s satisfactory academic performance shows that when she is placed in an environment that does not trigger her anti-social and disruptive behaviors, she can be successfully taught without requiring specialist educational resources.

The simple fact is that both parents have proposed preferred solutions to B.V.K.'s unique behavioral situation. Both solutions have been attempted, and only Taylor's solution, homeschooling, has been consistently successful. We do not mean to suggest that Nathan's preference for public schooling is neglectful or makes him a bad parent. But both parties recognize that a resolution to this impasse will not occur without court intervention. And B.V.K.'s educational path *must* be determined, and the earlier the better. Thus, the impasse meets the standard of a substantial and material change in circumstances. It was not contemplated by the decreeing court, is permanent, and directly relates to the child's well-being. *See id.* at 158. On this issue, B.V.K.'s improved behavior resultant from her trial homeschooling period juxtaposed against all of the problems she exhibited when placed in a formal school setting lead us to conclude that, based on these specific facts, homeschooling serves her best interests. Therefore, Taylor has shown that the decree should be modified to require that B.V.K. be homeschooled, unless and until Nathan and Taylor mutually agree otherwise.

That conclusion, however, does not end the inquiry. Knowing what is best for B.V.K. is not the same as knowing what a court may do about it. Understandably, the district court believed that the only way to resolve the

parents' impasse was to award one of them sole legal custody of all three children—justifiable confusion of *Frazier*'s reach following issuance of *Venechuk*. That belief—rather than the merits of homeschooling versus public school—is the error.

## II.    *Venechuk* **Narrows** *Frazier*

In *Frazier*, the supreme court addressed what joint legal custodians must do when they disagree over a decision committed to them both. The parents there disputed whether to give their children the COVID-19 vaccine. 1 N.W.3d at 778. The decree said nothing about vaccination, and rather than petition to modify the decree, the mother filed an "application for determination" asking the court to decide the question for them. *Id.* at 778–79. The court held that a free-standing application of that kind—one that asked the court not to modify or enforce the decree but simply to referee a parenting decision—was beyond the district court's authority. *Id.* at 787–88.

We read *Frazier* for what it decided. It held that a court cannot answer a "free floating" question about the raising of a child untethered from any proper request to modify or enforce the decree. *Id.* It did not hold that the only way to resolve a custodial impasse properly raised by a modification petition is to transfer sole legal custody. The supreme court confirmed as much the following year in *Venechuk*, 20 N.W.3d at 474.

*Venechuk* corrected a reading of *Frazier* identical in spirit to the one Nathan ascribes to the district court. A panel of this court had concluded that *Frazier* required every modification touching a subject of legal custody to seek sole legal custody, and that a petition asking for less was "doomed." *Venechuk v. Landherr*, No. 23-0826, 2024 WL 2312559, at *2 (Iowa Ct. App. May 22, 2024), *vacated*, 20 N.W.3d 471. The supreme court disagreed:

On further review, we disagree with the court of appeals majority's overly narrow reading of *Frazier*. Generally speaking, a court that entered a custody decree has authority to modify it when requested to do so. The requested modification does not have to relate to who has legal custody but can relate to another aspect of the decree.

*Venechuk*, 20 N.W.3d at 472. The supreme court did not say a custody decree may be modified only by reallocating custody. It said the opposite: the requested change "does not have to relate to who has legal custody." *Id*. Thus, the dividing line *Venechuk* drew is not the subject of the dispute but its posture—whether the litigant asks the court to modify or enforce its decree, or instead asks it to answer, from nothing, a free-standing question about how a child should be raised:

As recognized by the court of appeals dissent, authority to grant relief is lacking when the court is being asked *not to modify or enforce its decree* but simply to answer a "free floating" question about the raising of a child. That was the situation in *Frazier*, but it isn't the situation here.

*Id*. The court explained that *Frazier* came out as it did not because the mother raised a custodial subject but because the dissolution decree gave the court nothing to act upon: "We held that in the absence of a motion to modify some aspect of the decree—and in *Frazier* there was nothing but the joint legal custody provision to modify—the mother's motion could not succeed." *Id*. at 477. *Frazier's* "doom[ed]" language was thus the consequence of a particular defect: a parent who had nothing to seek to modify and who did not assert a change in circumstances. *See id*. at 476. But where a parent does invoke a proper modification proceeding—as Taylor did here—and asks the court to alter the decree's educational arrangement for the child on a substantial change in circumstances, *Frazier* is no bar.

## A. The Absence of a School-District Clause Changes Nothing

We do not find the decree's silence on schooling as decisive. To reason that *Venechuk* is distinguishable from this case because the decree there named a school district while the Van Kooten decree does not is incorrect for two reasons.

First, if the presence of a school-district clause is what licenses a court to act, then the reach of judicial authority turns on an accident of drafting—on whether, years earlier, two people ending a marriage or establishing a custodial arrangement happened to anticipate a fight not yet born. A rule that limits a party's ability to seek court intervention to serve a child's best interests by hinging that access on the foresight of the stipulation that governed the parents' parting is untenable. *See Venechuk*, 2024 WL 2312559, at *3 (Langholz, J., dissenting) .

Second, the school-district clause in *Venechuk* was not the holding. The supreme court did not hold that a court may modify a decree if and only if the decree contains an express clause on the disputed subject. It held that a court may modify a decree when a litigant properly invokes a modification proceeding and seeks to alter the decree's arrangements on a showing of changed circumstances, and it grounded that authority in the nature of a custody decree as a continuing judgment:

> A judicial decree, such as the child custody and support decree at issue here, is a judgment. This means that it is subject to the rules governing judgments. . . . Notwithstanding principles of res judicata, a judgment that grants continuing relief—like a child custody and support decree—may be modified based on changed circumstances.

20 N.W.3d at 477 (internal citations omitted). Every custody decree is a continuing judgment of that kind, whether or not it spells out a school

district. The Van Kooten decree granted joint legal custody, which by statute carries "equal participation in decisions affecting the child's . . . education." Iowa Code § 598.1(3) (2020). That is the decree's arrangement for schooling. When the parents reach impasse, a court asked to modify that arrangement—by petition, on changed circumstances—does precisely what *Venechuk* says a court may do. The decree is the judgment; the child's behavioral crisis leading to the school impasse is the changed circumstance; the petition is the vehicle. Nothing more is required.

## B. The Power the Court May Exercise at the Decree it May Exercise on Modification

The strain in a contrary reading surfaces when one asks a simple question: what could a court have done with this very child and this very dispute had it arisen one step earlier? Suppose these parents had presented their disagreement over B.V.K.'s schooling at the time of the original decree. No one doubts the answer. The court could have weighed the child's best interests, ordered that B.V.K. be homeschooled, written that arrangement into the decree, and bound both parents to it—all without disturbing their joint legal custody. The supreme court has said as much: "Beyond the initial custody decree, where the court is allowed to make decisions in the child's best interest, the Iowa statutory scheme places parental decisions with the parents, not the court." *Frazier*, 1 N.W.3d at 781.

If a court may decide B.V.K.'s schooling on its merits at the initial decree and leave joint custody intact, it is hard to see why the same court, facing the same child and the same question on modification, may reach that result only by stripping a parent of legal custody. Same court, same equitable power, same child, same evidentiary record. The only thing changed is the calendar date. A modification court sits in the same continuing equitable

jurisdiction over the same judgment, *see Venechuk*, 20 N.W.3d at 477, and may modify "another aspect of the decree" than legal custody, *id.* at 474. A sound rule does not make the permissibility of an outcome for a child turn on whether her parents' disagreement ripened before or after the ink dried on their decree. *Venechuk* repaired exactly that arbitrariness.

### C. The Remedy Should Be as Small as the Dispute

We agree with the predicate that controls everything else: a parental impasse of this kind is a substantial and material change in circumstances. B.V.K.'s behavioral deterioration was not contemplated by the court that entered the 2021 decree; it is permanent in the relevant sense, having persisted across daycares, begindergarten, and kindergarten; and it bears directly on her welfare. *See Frederici*, 338 N.W.2d at 158. On the schooling merits, too, we reach the same conclusion as Taylor. B.V.K. was removed from multiple daycares before she was old enough to be required in any classroom. She was suspended from begindergarten after injuring an adult, readmitted only on a half-day schedule and only after the AEA intervened, and even then could not reliably be held in the room. When she was homeschooled, her behavior settled and her studies advanced; when the temporary injunction returned her to a public classroom, the disruption returned with her. On this record, homeschooling serves B.V.K.'s best interests.

But the remedy must answer to the dispute that produced it, and here it did not. The error is one of breadth. The only decision on which these parents are deadlocked concerns one child—B.V.K.—and one subject— where she is schooled. Yet the district court's decree severs Nathan's legal custody not only as to B.V.K. but as to E.V.K. and A.V.K. as well: two children about whom the record discloses no disagreement of any kind. E.V.K. is

thriving in the very public school her father favors; A.V.K. is not yet of school age. There is no decision in conflict as to either of those children, no deadlock to break, or any word of testimony that Nathan's continued voice in their upbringing disserves them.

The Code permits a court to deny a parent joint legal custody only on "clear and convincing evidence . . . that joint custody is unreasonable and not in the best interest of the child to the extent that the legal custodial relationship between the child and a parent should be severed." Iowa Code § 598.41(2)(b) (2024). That is an exacting, child-specific standard. It cannot be satisfied wholesale by attributing to two children a conflict that belongs only to their sister. To strip a fit father of his custodial voice over children whose upbringing is not in dispute is not a remedy tailored to a changed circumstance—it is a penalty in search of one.

Nor is the record merely silent on whether joint custody is unreasonable. It runs the other way. These parents communicate about their children's needs, adjust visitation between themselves without court intervention, and have together attended IEP meetings, conferences, and school events. The principal testified that when an issue arises, the two "come together" to decide it. Their cooperation on every axis but one is not the backdrop against which the severance must be judged; it is affirmative evidence that joint legal custody remains reasonable and workable—the precise inverse of the showing section 598.41(2)(b) demands before a custodial bond may be cut.

We are mindful *Frazier* forbids a court to "parcel out" one strand of legal custody while leaving the rest joint. *Cf. Frazier*, 1 N.W.3d at 779–80. But *Venechuk* is the more recent word:

14

> In *Frazier*, we also discussed whether a district court could resolve a dispute over a postdecree change of school for a minor child. *See id.* at 782–84. We said it could do so when a party filed a petition to change the school. *Id.* at 784. We approved of several unpublished opinions of the court of appeals in which this had occurred. *Id.* 783–84. *None of those cases involved a request for sole legal custody*. *Id.* We said that those cases were "properly before the district court" and that this was "the proper course of action . . . to invoke the district court's authority." *Id.* at 783, 784.

*Venechuk*, 20 N.W.3d at 476 (ellipsis in original) (emphasis added). *Venechuk* opened the narrower door. A court with a properly filed modification petition may resolve the single school-choice impasse as an objective arbiter, deciding what B.V.K.'s best interests require, without disturbing legal custody at all. *Id.* (expressing approval of school-choice resolutions in which "[n]one of those cases involved a request for sole legal custody").

Additionally, the unbundling language in *Frazier* is often misunderstood:

> Nor does Iowa's statutory definition of "joint legal custody" allow district courts to unbundle legal custodial rights to carve out a limited right *for one parent to be the sole decision-maker* over the children's COVID-19 vaccinations while maintaining joint legal custody. *See* [*In re Marriage of*] *Makela*, 987 N.W.2d [467,] 471 [Iowa 2024]; *see also In re Marriage of Sokol*, 985 N.W.2d 177, 182 (Iowa 2023) (declining to disturb the court of appeals decision that granting one parent final decision-making authority was inconsistent with joint legal custody). "For us to interpret the statute to achieve some policy objective found nowhere in the statute's language invades a sphere reserved for the legislature." *Tripp v. Scott Emergency Commc'n Ctr.*, 977 N.W.2d 459, 467–68 (Iowa 2022). "Our task is to interpret the statute, not improve it." *Id.* at 468 (quoting *Brakke v. Iowa Dep't of Nat. Res.*, 897 N.W.2d 522, 541 (Iowa 2017)).

1 N.W.3d at 786 (emphasis added). The above cited language would prohibit the district court fashioning a modification decree that stated "Taylor shall decide all future schooling decisions for B.V.K. and the parties shall maintain

joint legal custody of B.V.K." But that is different than the district court fashioning a modification decree that states "B.V.K. shall be educated through a homeschooling program." The former—"Taylor shall decide all future schooling decisions"—is a structural reallocation of custodial authority. It hands one parent a standing, prospective power to make a category of decisions unilaterally, while nominally preserving joint legal custody. That is precisely the "unbundling" *Frazier* forbids: it carves a decision-making *right* out of the joint-custody bundle and assigns it to one parent. The label "joint legal custody" remains, but the substance of shared authority over education is gone. *Frazier* (and *Sokol*) say the statutory definition of joint legal custody does not permit that severance. *Frazier*, 1 N.W.3d at 786; *Sokol*, 985 N.W.2d at 182.

The latter—"B.V.K. be educated through a homeschooling program"—does not reallocate authority at all. The court itself resolves a single, concrete, presently-ripe dispute. Neither parent is given ongoing unilateral control; the *court* exercises its own equitable power to settle the matter before it. Both parents retain their full bundle of joint legal custodial rights, including the right to be heard on, and to seek modification of, future educational questions. Nothing has been carved out and handed to one parent. The line is between delegation and adjudication. Unbundling delegates a slice of legal custody to a parent on a forward-looking basis. Resolving the dispute is the court doing what courts do—deciding the actual controversy without redistributing the underlying custodial rights. *Frazier*'s prohibition runs to the former, not the latter.

We do not pretend this case falls neatly within *Venechuk*'s exact facts. *Venechuk* involved a decree that set a school district; this decree set none, and to that extent, our holding asks *Venechuk* to take one further step. But of the

two available steps, this is the sounder one. "The legislature and judiciary of this State have adopted a strong policy in favor of joint custody, from which courts should deviate only under the most compelling circumstances." *In re Marriage of Winnike*, 497 N.W.2d 170, 173 (Iowa Ct. App. 1992); *see also In re Marriage of Behn*, 385 N.W.2d 540, 541 (Iowa 1986) ("The legislature has unequivocally expressed its preference for joint custody . . . ."). Iowa courts have applied that preference consistently and for good reason: joint custody keeps both parents invested in the rights, responsibilities, and joys of raising their children. *In re Marriage of Weidner*, 338 N.W.2d 351, 359 (Iowa 1983) ("Joint custody is preferred because, properly tailored to the parties' circumstances, joint custodial arrangements will often go a long way toward encouraging both parents to share the rights, responsibilities, and frequently joyful and meaningful experiences of raising their children.").

The competing step—that a court may resolve a parental impasse only by severing one parent's custody—would stand that policy on its head, making the most drastic remedy the only one available and forcing courts to dissolve a joint-custodial bond every time two fit parents disagree about a single decision. And there is wisdom in keeping the remedy as small as the problem. Telling parents who agree about medicine, religion, discipline, and the whole architecture of a childhood, but who cannot agree about a single school, that one of them must be stripped of a voice in *all* of it is not what these parents bargained for, not what the decree provided, and not what the children's best interests require. It is, instead, the "problematic and odd result[]" Judge Langholz warned would follow from reading *Frazier* too broadly. *Venechuk*, 2024 WL 2312559, at *4 (Langholz, J., dissenting).

Converting a fit father into a parent shorn of legal custody to all three of his children because of one good-faith disagreement about one of his

children's educational paths runs contrary to half-a-century of case law. *See In re Marriage of Burham*, 283 N.W.2d 269 (Iowa 1979) (affirming sole custody to the father where a clinical psychologist likened the home to an armed camp, the court reasoning that imposing joint custody on embittered parents accusing each other of serious wrongs can only enhance familial chaos); *In re Marriage of Bolin*, 336 N.W.2d 441, 446 (Iowa 1983) (recognizing that although mere tension between parents will not alone defeat joint custody, one parent's obduracy that renders joint custody unworkable may justify sole custody in the other parent in a modification proceeding); *In re Marriage of Weidner*, 338 N.W.2d 351, 358–59 (Iowa 1983) (affirming sole custody to the mother where mutual antagonism, lack of respect, and an inability to communicate about the children's needs made the parents unable to function except when wholly separated, rendering joint custody unworkable); *In re Marriage of Leyda*, 355 N.W.2d 862, 865–67 (Iowa 1984) (granting sole custody to the father where the mother lacked maturity as a role model and, in total disregard of the child's emotional well-being, sought to sever the child's relationship with the father by relocating out of state and cutting off contact for roughly six months); *In re Marriage of Miller*, 390 N.W.2d 596, 602 (Iowa 1986) (reinstating sole custody to the mother and rejecting joint custody where the parents' hostility and total inability to communicate—marked by physical confrontations, police intervention over visitation, and failed joint counseling—was clear and convincing evidence that joint custody was unreasonable and not in the children's best interests); *In re Marriage of Rolek*, 555 N.W.2d 675, 676–77 (Iowa 1996) (modifying a joint-custody decree to vest sole custody in the mother where the parties' post-decree conduct showed they could no longer cooperate).

## III. Contempt

Nathan also requests that we hold Taylor in contempt for unilaterally removing B.V.K. from the public school system. We defer to the district court's credibility determination that following homeschooling discussions, Taylor "believed that since she had . . . physical care, she could make the decision to homeschool after discussing it with Nathan." *See In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). As the district court explained, "proof beyond a reasonable doubt" is required to establish a finding of contempt. *Gimzo v. Iowa Dist. Ct.*, 561 N.W.2d 833, 835 (Iowa Ct. App. 1997). It was not unreasonable for the district court to conclude that Taylor acted in good faith. We decline to reverse the district court on Nathan's requested contempt finding.

## IV. Attorney Fees

Lastly, Nathan requests trial and appellate attorney fees, and Taylor requests appellate attorney fees. The trial court enjoys "considerable discretion" in awarding attorney fees and overturning the trial court's decision requires an abuse of discretion. *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993). Our decision on whether to award appellate attorney fees "is guided by the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.*

We decern no abuse of discretion in the district court's attorney fee determination. Likewise, we have closely considered the unique nature of the record before us, the parties' respective appellate-attorney-fee affidavits, the parties' abilities to pay, and both parties' success on appeal. We accordingly award no appellate attorney fees.

## CONCLUSION

We reverse the district court's grant of sole legal custody to all three children to Taylor as not in their best interests. We remand with directions to modify the decree to provide that B.V.K. be educated through Taylor's homeschooling program—essentially a lesser-included request in the petition to modify—and order that the parties otherwise remain joint legal custodians to all three children. The district court reached the right result for B.V.K. by the wrong route. The narrower path was open and we take it. Rather than break down a wall, we walk through the open door.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Tabor, C.J., concurs; Chicchelly, J., dissents.

**CHICCHELLY, Judge** (dissenting).

When this court decided *In re Marriage of Frazier* three years ago, we were concerned that requiring parties to petition for legal custodial modification in circumstances similar to those in this case "effectively gives greater authority to the road-blocking party in any custodial dispute. It further encourages contempt proceedings, which are of no assistance in the actual making of the decision and do not protect the parents' equal rights or the children's best interests." No. 22-06861, 2023 WL 4104024, at *3 (Iowa Ct. App. June 21, 2023), *vacated*, 1 N.W.3d 775, 781 (Iowa 2024). Even with the benefit of the supreme court's decisions since its decision in *Frazier*, I fear that is where things stand. Further, our court has repeatedly issued split decisions in these cases,[2] and so it is unsurprising that our district courts and the litigants who come before them are also struggling for clarity in terms of approaching any dispute involving parents' legal custodial rights.

In this case, the majority modifies the dissolution decree and orders B.V.K. must be educated through Taylor's homeschooling program despite the fact that no schooling provision exists in the decree. But in *In re Marriage of Frazier* our supreme court said, "the Iowa statutory scheme places parental decisions with the parents, not the court." 1 N.W.3d 775, 781 (Iowa 2024). Because the majority has elected to dive into the fray, I must respectfully dissent.

---

[2] This case joins a chain of cases from this court's 2-1 decisions in this area. *See, e.g.*, *Frazier*, 2023 WL 4104024, at *2; *Venechuk v. Landherr*, No. 23-0826, 2024 WL 2312559, at *2 (Iowa Ct. App. May 22, 2024), *vacated*, 20 N.W.3d 471 (Iowa 2025); *see also In re Marriage of Milne*, No. 20-0228, 2020 WL 5230461, at *9 (Iowa Ct. App. Sept. 2, 2020) (Vaitheswaran, P.J. concurring in part, dissenting in part) (addressing the court's ability to "unbundle" a parent's custodial rights).

# I.

Joint legal custodians "are entitled to '*equal participation* in decisions' affecting their children's 'legal status, medical care, *education*, extracurricular activities, and religious instruction.'" *Frazier*, 1 N.W.3d at 779 (second emphasis added) (quoting Iowa Code § 598.1(3) (2022)). And our supreme court has been clear that this scheme "leaves no room for a parceling of rights." *Id.* (quoting *In re Marriage of Makela*, 987 N.W.2d 467, 471 (Iowa Ct. App. 2022)).

The majority asserts they do not violate these unbundling provisions because its preferred modification would read "B.V.K. shall be educated through a homeschooling program" instead of stating "Taylor shall decide all future schooling decisions for B.V.K. and the parties shall maintain joint legal custody of B.V.K." But the majority opinion goes further and remands to the district court "with directions to modify the decree to provide that B.V.K. be educated through *Taylor's* homeschooling program." That is the exact type of modification our supreme court forbade in *Frazier*. *See id.* ("Effectively, Mary is asking the district court to diminish—in one area—Shannon's right to equal participation in a decision affecting the children's medical care."). In my view, the majority's modification "attempts to end-run around the dissolution decree that gave the parents joint legal custody." *Id.* at 778.

Instead, our court should—as binding precedent guides—hold steady "until the parents can either reach a mutually agreeable course of action together or modify their custody agreement." *Id.* at 779. Because the district court correctly determined the parents' impasse warranted a change in legal custody, I dissent from the majority's determination that we have the

authority to modify the decree to include a new education provision allowing for homeschooling.

## II.

The majority further asserts that its modification is allowable under *Venechuk v. Landherr*, 20 N.W.3d 471 (2025). I disagree. I read *Venechuk* to allow modification without changing legal custody only when a decree expressly includes a provision that is the subject of the parties' dispute. *See* 20 N.W.3d at 476–77 ("Here, by contrast, the original decree contained a provision stating which school M.L. would attend. That was the provision that Katie sought to modify, and she could do so without also seeking to obtain sole legal custody.").

The supreme court decided *Venechuk* the year following *Frazier* and clarified when a modification is appropriate. The *Venechuk* majority distinguished *Frazier* by stating:

> *Frazier* involved a different situation. The decree had no provision concerning vaccination. The mother, who had . . . physical care of the children, wanted them to receive the COVID-19 vaccine; the father did not. The mother filed a motion to obtain judicial authorization to proceed with vaccination. At the same time, the mother disclaimed any interest in modifying the parties' joint legal custody of the children. We held that in the absence of a motion to modify some aspect of the decree—and in *Frazier* there was nothing but the joint legal custody provision to modify— the mother's motion could not succeed.

*Id.* at 476 (internal citations omitted).

This case, similarly, contains no such provision. That lends the question: What exactly are we modifying? This case is much closer to *Frazier* than *Venechuk* in its facts, and the *Frazier* court was clear, "*Beyond the initial custody decree*, where the court is allowed to make decisions in the child's best

23

interest, the Iowa statutory scheme places parental decisions with the parents, not the court." 1 N.W.3d at 781 (emphasis added). We are beyond the initial decree, which contains no provision regarding the child's education. So, we must leave that decision to the child's legal custodians.

And in a case like this one, where the legal custodians cannot agree, that amounts to "a substantial and material change in circumstances." The majority concedes as much. Because there is no provision "but the joint legal custody provision to modify," I agree with the district court that "it is in the best interest of the children that Taylor be granted sole legal custody." *See Venechuk*, 20 N.W.3d at 476.

### III.

Because I would apply *Frazier* and *Venechuk* to find that the only allowable modification of the decree in this case is one that modifies legal custody of the children, and do not believe we have the authority to otherwise modify the child's educational placement when the decree is silent to it, I respectfully dissent.